IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION


GARY W. RADER,                          )
                                        )
                Plaintiff,              )
                                        )
v.                                      )        No. 2:06-CV-201
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
                Defendant.              )


## MEMORANDUM OPINION


This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of

defendant Commissioner's final decision denying plaintiff's claim for disability insurance

benefits under Title II of the Social Security Act. For the reasons provided herein,

defendant's motion for summary judgment [doc. 12] will be granted, and plaintiff's motion

for judgment on the pleadings [doc. 10] will be denied. The final decision of the

Commissioner will be affirmed.

### I.

### *Procedural History*

Plaintiff applied for benefits in September 2003, alleging a disability onset date

of December 29, 2000. [Tr. 56]. He is purportedly disabled by pain in his neck, arms, back,

hands, legs, and hips, along with depression and diabetes which he is "unable" to control.

[Tr. 66, 104].

The application was denied initially and on reconsideration. Plaintiff then received a hearing before an Administrative Law Judge ("ALJ") in November 2005. On January 11, 2006, the ALJ issued a decision denying benefits. He found that plaintiff suffers from "a back disorder, a left shoulder disorder, history of fibromyalgia, diabetes mellitus, obesity, an adjustment disorder with depressed mood, and borderline intellectual functioning," which are "severe" impairments but not equal, individually or in concert, to any impairment listed by the Commissioner. [Tr. 25]. Following a discussion of the many medical assessments contained in the administrative record, the ALJ concluded that plaintiff retains the residual functional capacity ("RFC") to work at the medium level of exertion subject to mild to moderate mental and intellectual limitations. [Tr. 25]. Citing several examples of symptom exaggeration, the ALJ found that plaintiff's subjective complaints are not entirely credible. [Tr. 23, 26-29]. Further citing vocational expert testimony, the ALJ found plaintiff ineligible for benefits. [Tr. 28-29].

Plaintiff then sought review from the Commissioner's Appeals Council. Review was denied on July 6, 2006. [Tr. 2, 9]. The ALJ's ruling therefore became the Commissioner's final decision. *See* 20 C.F.R. § 404.981. Through his timely complaint, plaintiff has properly brought his case before this court for review. *See* 42 U.S.C. § 405(g).

## II.

*Background*

Plaintiff was born in 1947 and has a twelfth grade education.  [Tr. 56, 72].  Although he graduated high school in 1966, plaintiff did not enter the military - instead receiving a deferment "based upon a back condition."  [Tr. 237].  His past relevant work is as a garbage truck driver, and he last worked on December 29, 2000.  [Tr. 67, 78].

Plaintiff is approximately 70 inches tall and weighs between 240 and 279 pounds.  [Tr. 238, 497].  He eats "whatever he wants."  [Tr. 506].  Plaintiff claims constant, all-consuming pain throughout his body which is aggravated by virtually any activity.  [Tr. 86, 88, 108, 113, 238, 318-19].  He states that he is "in so much pain that seems to be all I can concentrate on." [Tr. 93].

Plaintiff is purportedly unable to ambulate without a cane, cannot attend independently to his personal needs, and must change positions at least every ten minutes.  [Tr. 88, 92, 108, 128, 356, 358].  He can, however, admittedly drive short distances, shop, cook, visit friends, play cards, attend church approximately twice weekly, and perform some housework.  [Tr. 86-87, 94-95, 114, 262, 319, 592, 594].  He maintained a garden through at least the summer of 2003.  [Tr. 319].

III.

*Relevant Medical Evidence*

A. <u>Physical</u>

X-rays indicate nonacute lumbar changes dating back to at least 1994. [Tr. 156]. In January of 1998 or 1999, consulting orthopaedist Charles Barnes described "a difficult complex of cervicobrachial strain and left shoulder pain . . . related to rotator cuff tendinitis and/or acromioclavicular arthritis." [Tr. 176]. Dr. Barnes noted that contemporaneous x-rays showed mild "degenerative disc disease at C-5/6 and C-6/7" along with "some mild degenerative change" in the left shoulder. [Tr. 173-74]. A March 1999 MRI showed "no obvious rotator cuff tear" but "significant" changes were present in the shoulder joint. [Tr. 171].

Neurologist Ziad Blaik evaluated plaintiff in late-1999 through mid-2000.[1] Dr. Blaik noted excessive tenderness in the neck, shoulder, and arm. [Tr. 179]. 1999 cervical MRIs were described by Dr. Blaik as "unremarkable" beyond "minor degenerative arthritic change." [Tr. 181]. However, Dr. Philip Marino opined that February 2001 cervical imaging showed "extensive" spondylosis but no spondylolisthesis. [Tr. 193-94].[2]

---

[1] Dr. Blaik's records contain two pages pertaining to a female patient with the same last name - but different patient account number - as plaintiff. [Tr. 184-85]. It is obvious that these pages were inadvertently included in plaintiff's file and, as such, have not been considered by the court.

[2] Spondylosis is "a general term for degenerative spinal changes due to osteoarthritis." *Dorland's Illustrated Medical Dictionary* 1684 (29th ed. 2000). Spondylolisthesis is the forward
(continued...)

In 1999, Dr. Coy Stone noted a history of diabetes and "chronic problems" with the neck and left shoulder. [Tr. 146]. In 2002, Dr. Stone noted decreased range of motion in the neck and shoulders, along with decreased grip strength. [Tr. 136].

Orthopaedist Michael Menz treated plaintiff for alleged neck and arm pain secondary to a December 29, 2000 on-the-job sweeping injury. [Tr. 165]. Dr. Menz initially suspected that the pain was an aggravation of plaintiff's 1994 neck and shoulder problems. [Tr. 165]. In September 2001, Dr. Menz noted a bulging disc. [Tr. 164]. That same date, he questioned "who is giving him all these medications[.]" [Tr. 163-64]. Plaintiff told Dr. Menz that "he just hurts all the time," and was "tearful and emotional." [Tr. 163]. Among other things, plaintiff reported "trembling" legs and an inability to maintain his arms in a raised position. [Tr. 162].

Physical therapist A.R. Rhea performed a Functional Capacity Assessment in November 2001. Plaintiff projected in the sedentary work classification, but testing was noted to be "invalid" due to "poor" and "inconsistent" effort. [Tr. 423, 430-31].

In November 2001, Dr. Menz wrote that plaintiff "might want to . . . apply for disability" due to his multiple complaints. [Tr. 161]. In December 2001, he opined that plaintiff has a ten percent whole body impairment. [Tr. 160]. One month later, however, Dr. Menz dramatically amended his opinion as follows:

---

[2](...continued)
displacement of one vertebra over another. *Id.*

Mr. Rader had last office visit on November 20th[,] 2001.  He stated at that time that he was having a lot of problems with his neck and shoulders.  He has been describing the pain for a long period of time.  *I reviewed a tape of Mr. Rader dated 10-23/24 01.  On that tape, he is noted to be able to open glass doors, walk around, raise the arms up and does not appear to have any of the symptoms which he was suffering in our office.  I think he may have been exaggerating his symptoms a great deal and has no additional impairment* compared to his previous impairment of August 1995.  *I do not believe he has any new impairment*.

[Tr. 159-60] (emphasis added).[3]

March 2001 chest x-rays showed "no acute cardiopulmonary disease." [Tr. 223].  May 2004 chest x-rays again showed "no acute cardiopulmonary abnormalities." [Tr. 282].

On December 1, 2003, plaintiff received a prescription for a cane from a physical therapy source.  [Tr. 296].  On December 3, 2003, Dr. Marianne Filka performed a consultative examination.  Plaintiff was using a cane, although Dr. Filka noted that "[h]e is able to walk without the cane and I do not see any changes in his gait with or without the cane."  [Tr. 323].  Plaintiff was described as "spend[ing] a lot of time during the exam sighing and moaning.  He is quite dramatic in his presentation.  His breathing is more rapid that [sic] it should be for no particular reason." [Tr. 320].  Joint appearance, range of motion, and strength were full throughout. [Tr. 322].  Dr. Filka concluded:

---

[3]  The videotape's origin is unexplained in the administrative record, but the court presumes plaintiff was surreptitiously filmed in connection with a worker's compensation claim.  Regardless, while the origin of the tape is unclear, the impact of treating orthopaedist Menz's statement is not.

Because of this gentleman's psychiatric overlay, I am not clear how much actual pain this gentleman is having. I would suggest that SSI [sic] consider a psychological or psychiatric evaluation of this gentleman. I think his evaluation is quite difficult because he shows some exaggerating symptoms of the discomfort that he has. I would recommend that he may be able to hold down part-time or full-time work at light duty only and his main limitation would be no repetitive bending and no lifting over about 10 pounds maximum. I would not put this gentleman at any other restrictions. I personally do not feel that this gentleman needs to use a cane.

[Tr. 324].

A state agency physician (name illegible) completed a Physical RFC Assessment in February 2004. The physician predicted that plaintiff could work at the medium level of exertion [Tr. 346] with no secondary limitations (postural, environmental, etc.). [Tr. 347-49].

Dr. David McConnell performed a consultative physical examination in September 2004. Plaintiff reported "that he is unable to use his arms because they 'go numb.'" [Tr. 361]. Examination of the extremities showed "full range of motion without pain." [Tr. 363]. X-rays of the lumbosacral spine indicated only "minimal degenerative disc disease." [Tr. 364]. Dr. McConnell observed that plaintiff "gave a very poor effort" on his pulmonary function study. [Tr. 364]. Chest x-rays were "suggestive of borderline cardiomegaly and pulmonary fibrosis." [Tr. 364].[4] Dr. McConnell concluded that plaintiff

---

[4] Cardiomegaly is enlargement of the heart. *Dorland's Illustrated Medical Dictionary* 287, 859 (29th ed. 2000). Pulmonary fibrosis is chronic inflammation and formation of fibrous tissue in the pulmonary walls. *Id.* at 673.

could work essentially at the medium level without further physical restriction.  [Tr. 365].[5]

Dr. McConnell further recommended evaluation "by a psychiatrist/psychologist since depression seems to be a major part of this gentleman's claim for Social Security." [Tr. 365].

Dr. Denise Bell completed a Physical RFC Assessment in November 2004.  Dr. Bell predicted that plaintiff could work at the medium level of exertion [Tr. 397] avoiding concentrated exposure to respiratory irritants [Tr. 399] in light of Dr. McConnell's pulmonary study.  [Tr. 400].

In 2001, Dr. Stone described plaintiff's diabetes as "not controlled." [Tr. 138, 141].  In May 2004, plaintiff complained of stomach distress to nurse practitioner Tonya Henry ("ANP Henry") secondary to recent consumption of either barbeque or "fried chicken from the Dairy Dream."  [Tr. 267].  In response to plaintiff's report of high blood sugar levels, ANP Henry wrote that "given the recent [stomach] illness, ***as well as his past diet, I can understand why this is occurring***." [Tr. 267] (emphasis added).  The nurse practitioner

> encouraged [plaintiff] to monitor diet, fried chicken and Barbeque and eating out **are not consistent with a diabetic diet**.  Also, **cautioned** patient **against gaining any more weight**.  **This has negative effects on blood pressure, diabetes, as well as overall generalized health**.  Patient verbalizes understanding.  Girlfriend agrees to help encourage patient to have healthy lifestyle.

[Tr. 267] (emphasis added).  Nonetheless, in August 2004 ANP Henry recorded that plaintiff

---

[5] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567(c).  Dr. McConnell opined that plaintiff could occasionally lift or carry up to 40 pounds and frequently lift or carry up to 35 pounds.  [Tr. 365].

had gained seven pounds and was admittedly "eating too much." [Tr. 508]. She again

encouraged plaintiff to lose weight and to "decrease foods high in fat and carbohydrates."

[Tr. 508]. Plaintiff returned to ANP Henry's office the following day "upon [her] request

to discuss his most recent labs." [Tr. 506]. The nurse practitioner wrote in part:

> Patient does admit to eating whatever he has wanted to lately, which has led
> to his weight gain and obvious worsening of cholesterol panel. . . . Had a long
> serious discussion with patient regarding lifestyle changes that **must be made**.
> ***I explained to him that*** medications cannot do everything, and that ***he needs
> to take control of his life and his disease and start monitoring his food intake
> and make health choices***. Patient agrees to this.

[Tr. 506] (emphasis added).[6]

Despite ANP Henry's repeated admonitions, Dr. McConnell wrote the

following month that "[h]e does **not** follow a diabetic diet." [Tr. 361] (emphasis added). By

October 2004, ANP Henry noted that plaintiff had gained an additional four pounds. [Tr.

503], with another five pound gain recorded at his January 2005 appointment. [Tr. 499].

ANP Henry "<u>again</u>" [Tr. 499] (emphasis in original) encouraged diet and exercise "to help

control diabetes." This admonition was repeated in April 2005 in light of continued weight

gain. [Tr. 497].

In March 2005, plaintiff was diagnosed with severe sleep apnea. [Tr. 465-66].

Dr. Charles Cole recommended "[a]gressive weight loss with diet and exercise." [Tr. 466].

Plaintiff later reported that he was using a CPAP with good results. [Tr. 531].

---

[6]     Although he manifested agreement with ANP Henry's sage advice, plaintiff
contemporaneously, "tearfully," and "angrily" complained to a mental health source "that he cannot
seem to get any help with regard to pain medications[.]" [Tr. 549].

Physical therapist Tony Villanueva performed a Functional Capacity Assessment in November 2005, concluding that plaintiff is not capable of meeting the demands of sedentary work. [Tr. 567]. Mr. Villanueva observed no signs of symptom exaggeration. [Tr. 567-68].

In August 2001, consulting rheumatologist David Lurie diagnosed fibromyalgia, citing "[n]umerous and widespread tender points." [Tr. 247]. In December 2003, ANP Henry also diagnosed fibromyalgia, describing plaintiff as "frantic" and as tender "along almost entire body." [Tr. 277]. That same month, however, examining Dr. Filka found only some mild tenderness. [Tr. 322-23]. Dr. Stone noted Dr. Lurie's fibromyalgia diagnosis, but later wrote that plaintiff's "chronic somatic pain of unknown etiology [was] suggestive of fibromyalgia" but could also be attributed to psychological factors. [Tr. 135-36].

## B. Mental

Clinical psychologist Eric Engum performed an evaluation in July 2001 "to determine whether psychological factors were substantially exacerbating his subjective experience of pain." [Tr. 235]. After a review of the generally "mild" and "unremarkable" physical findings of record, Dr. Engum wrote that plaintiff "appeared totally preoccupied with his pain and frequently noted that the treating physicians were not listening to him, attending to his problem, or providing needed treatment." [Tr. 236]. "[I]t often appeared that he was so preoccupied with his own physical status and with his complaints that he was

prone to respond in his own personalized manner, irrespective of the questions propounded" by Dr. Engum. [Tr. 236]. Despite his extreme physical complaints, plaintiff reported an average general level of activity. [Tr. 238].

Testing suggested "a tendency to express psychological problems through somatic channels." [Tr. 241]. Dr. Engum opined that plaintiff was in the borderline range of intellectual functioning, with serious limitations in his thought processes and abstract reasoning skills. [Tr. 236]. Plaintiff's "content of thought was primarily dominated by somatic preoccupation." [Tr. 236].

Dr. Engum concluded that plaintiff's "subjective experience of pain is being exacerbated by underlying psychological factors." [Tr. 242]. It "appear[ed] that Mr. Rader has many unmet emotional and dependency needs which are now being expressed through his exaggerated symptomatic presentation." [Tr. 242]. Dr. Engum further concluded that he "would also strongly encourage Mr. Rader to maintain some involvement in his employment and to increase social and recreational activities such that he does not become more involutional and self-absorbed." [Tr. 243].

Clinical psychologist Roy Nevils performed a psychological evaluation in November 2003. Dr. Nevils opined only that plaintiff "might have some mild problems with memory and concentration" due to borderline to low average intelligence. [Tr. 263].

In December 2003, ANP Henry wrote that plaintiff recently "had appointments with Mental Health." [Tr. 274]. Plaintiff reported "doing well" with newly-prescribed

sleeping and antidepressant medications. [Tr. 274]. Anxiety and "crying spells" were much decreased. [Tr. 274].

ANP Henry's notations were apparently in reference to a December 2003 intake interview with social worker Mary Stokley. Ms. Stokley and reviewing psychiatrist Timothy Sullivan each diagnosed major depressive disorder and generalized anxiety disorder. [Tr. 302, 306]. At a subsequent "medication check" appointment, plaintiff reported some improvement in mood and sleep. [Tr. 297]. In March 2004, ANP Henry noted that plaintiff had not returned to counseling but was continuing to take an antidepressant. [Tr. 269]. He reported only "occasional episodes" of depression. [Tr. 269].

On December 30, 2003, Dr. James Trent completed a Mental RFC Assessment. He predicted only a moderate limitation pertaining to the understanding, remembering, and carrying out of detailed instructions. [Tr. 339-40].

John Thurman, Ph.D. and psychologist Charlton Stanley performed a psychological evaluation on September 3, 2004. Although there were "signs that the claimant was in pain," the evaluators described him as "histrionic." [Tr. 355]. Despite driving himself to the evaluation [Tr. 353], plaintiff "stated that he is unable to perform any activities of daily living **at all**. . . . He stated that he has 'a lady living with me who does it all.' He stated that he is not even able to provide for his own self-care and hygiene and that she bathes and 'washes my backside.'" [Tr. 356] (emphasis added). The examiners concluded that any workplace restrictions would be due to plaintiff's *physical* condition only,

except that his "moderate" depression could "potential[ly]" cause mild-to-moderate vocational limitations. [Tr. 356-59].

H. Frank Edwards, Ph.D. completed a Mental RFC Assessment on September 24, 2004. He predicted limitations of only a moderate degree in six vocational activities. [Tr. 374-75].

Plaintiff returned to Dr. Sullivan in June 2004. Dr. Sullivan again diagnosed major depressive disorder and generalized anxiety disorder. [Tr.552]. In December 2004, social worker Stokley opined that plaintiff's "depression and anxiety are obviously related to his pain." [Tr. 540]. Following a series of counseling sessions and "medication check" appointments, Dr. Sullivan and Ms. Stokley produced a vocational assessment in September 2005. They opined that plaintiff has "poor" to "no" ability in 14 of the 15 categories assessed. [Tr. 522-28].

IV.

*Vocational Expert Testimony*

At the administrative hearing, Donna Bardsley ("Ms. Bardsley" or "VE") testified as a vocational expert. Ms. Bardsley classified plaintiff's prior job as medium and semiskilled. [Tr. 597].

The ALJ posited a hypothetical claimant of plaintiff's size, education, and work history capable of no more than medium work. The hypothetical claimant would be further limited by borderline intelligence and the "potential" mild-to-moderate psychological

13

limitations referenced by evaluators Thurman and Stanley. [Tr. 598, 356-59]. In response, the VE identified a significant number of unskilled medium jobs existing in the regional and national economies that the hypothetical claimant would be capable of performing. [Tr. 598]. In the alternative, if physical therapist Villanueva's Functional Capacity Assessment were fully credited, all employment would be precluded. [Tr. 599]. Emotional limitations of more than a moderate degree would also preclude all work. [Tr. 599].

## V.

### *Applicable Legal Standards*

This court's review is confined to whether the ALJ applied the correct legal standards and whether his factual findings were supported by substantial evidence. 42 U.S.C. § 405(g)*; Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). Nonetheless, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 490 (1951).

A claimant is entitled to disability insurance payments under the Social Security Act if he (1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application for disability insurance benefits, and (4) is under a disability. 42 U.S.C. § 423(a)(1). "Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423 (d)(2)(A). Disability is evaluated pursuant to a five-step analysis summarized by the Sixth Circuit as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.

> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). Claimants bear the burden of proof at the first four steps. *See Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *See id.*

VI.

*Analysis*

A. <u>Past Relevant Work</u>

Plaintiff argues that the ALJ's findings of fact are inconsistent regarding residual functional capacity. The ALJ found that plaintiff remains capable of performing medium work, limited by borderline intelligence and the "potential" mild-to-moderate psychological limitations referenced by evaluators Thurman and Stanley. [Tr. 29]. Citing VE testimony, the ALJ concluded at step five of his sequential evaluation that plaintiff is capable of performing a significant number of medium jobs. [Tr. 28-29]. However, at step four, the ALJ concluded that plaintiff could not return to his prior job (also at the medium level of exertion) "[b]ased on the claimant's mental limitations." [Tr. 28]. As plaintiff correctly points out, the record does not make clear why plaintiff's mental limitations preclude his past work but not the other medium jobs identified by the VE.

The jobs cited by Ms. Bardsley are all unskilled [Tr. 598] whereas the prior employment was identified as semiskilled. [Tr. 597]. There is, however, no testimony that the hypothetical mental limitations would preclude semiskilled, but not unskilled, work. Typically, an ALJ will ask whether the hypothetical claimant could perform the plaintiff's prior work. That question was not asked in this case, and a subsequent clarifying question cited by the Commissioner ("I assume that they're all entry level unskilled jobs?") does not resolve the discrepancy. [Tr. 598]. It is noted that two potentially pertinent questions to the VE are transcribed as "inaudible." [Tr. 599].

Regardless, the ALJ's ultimate step five conclusion is sufficiently explained (as will be discussed further below) and is based on vocational evidence. That the ALJ could possibly have also denied plaintiff's claim at step four is irrelevant and is in fact an error in plaintiff's favor. Although the ALJ's step four conclusion is neither explained nor based on properly transcribed VE testimony, any potential error is deemed harmless.

B. <u>Substantial Evidence</u>

Plaintiff's two remaining arguments each essentially challenge the substantiality of the evidence upon which the ALJ's decision was based. Plaintiff contends that the ALJ did not consider the effect of his morbid obesity as required by Social Security Ruling 02-01p. More broadly, plaintiff also alleges that "the ALJ rejected and ignored the expert medical opinions of each and every treating, examining, and non-examining physician . . . [thereby] substituting his personal non-expert medical judgment over that of every actual

medical expert . . . [and] crossed the line from fact finding adjudicator to advocate-witness."

Plaintiff specifically identifies Dr. McConnell, "Dr. Flecka," Mr. Villanueva, and the two

state agency file-reviewing physicians as the sources whose opinions were summarily

rejected and ignored by the "advocate-witness" ALJ.

      As for SSR 02-01p, the court cannot agree that the effect of plaintiff's obesity

was not considered. The ALJ discussed plaintiff's obesity individually and in the context of

his multiple impairments. Individual discussion of multiple conditions does not imply that

the ALJ failed to consider the impairments' combined effect. *See Loy v. Sec'y of Health &*

*Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990).

      Further, SSR 02-01p "does not mandate a particular mode of analysis."

*Bledsoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006). The ruling notes the obvious

- that obesity can lead to, or complicate, cardiovascular and respiratory conditions, diabetes,

sleep apnea, musculoskeletal issues, and depression. *See* SSR 02-01p at *7 (Sept. 12, 2002).

However, the ruling does not require that the Commissioner "make assumptions" about the

effect of obesity on a particular claimant. *Id.* at *9. Instead, as always, the Commissioner's

decision must be "based on the information in the case record." *Id.*

      It is noteworthy that plaintiff does not cite any objective evidence that was not

considered by the ALJ. [Doc. 11, p. 6-7]. Instead, he invites the court to make assumptions

regarding obesity's general effect on breathing, pain, fatigue, and range of motion. This

court's substantial evidence review must look to objective evidence rather than speculation.

For all of these reasons, plaintiff's SSR 02-01p argument fails.

Turning to the physicians and other conditions that the ALJ purportedly ignored, plaintiff first mentions Dr. McConnell. He terms Dr. McConnell a "treating physician" who "opined that claimant is limited to sedentary exertion." These statements are wholly incorrect. Dr. McConnell was instead a one-time consultative examiner who opined that plaintiff could work at more than the *light* level, and just under the *medium* level, of exertion. [Tr. 361, 365]. The ALJ adequately explained the decision not to fully accept Dr. McConnell's opinion, citing: (1) plaintiff's "very poor effort" on testing; (2) the physician's partial reliance on plaintiff's unreliable subjective complaints; and (3) inconsistency with the objective evidence as a whole. [Tr. 26, 364-65].

Plaintiff next cites the opinion of a "Dr. Flecka." The court presumes that plaintiff is referring to "Dr. Filka," who restricted plaintiff to no more than light work. The ALJ adequately accounted for his rejection of that opinion. [Tr. 26]. Dr. Filka noted symptom magnification, her restrictions exceeded her essentially unremarkable findings, and she acknowledged that her "evaluation [was] quite difficult because he shows some exaggerating symptoms[.]" [Tr. 320-24].

Plaintiff next cites the opinion of physical therapist Villanueva, who limited plaintiff to less than sedentary exertion. As noted by the ALJ, Mr. Villanueva based his assessment in part on plaintiff's unreliable subjective complaints and his "self-limiting behavior." [Tr. 26, 568]. Further, as a physical therapist, Mr. Villanueva is not an

"acceptable medical source" who can provide evidence to establish an impairment, *see* 20 C.F.R. § 404.1513(a), and it is entirely within the Commissioner's discretion whether to consider the opinion of a physical therapist at all. *See* 20 C.F.R. § 404.1513(d). The ALJ did not err in dismissing Mr. Villanueva's assessment.

Plaintiff next argues that the ALJ should have accepted two restrictions allegedly offered by the two file-reviewing state agency physicians: (1) that he requires a sit-stand option; and (2) that he should avoid concentrated exposure to pulmonary irritants. The court has reviewed the RFC Assessments completed by the two reviewing physicians. Neither imposed a sit-stand requirement. [Tr. 346, 397]. As for reviewing physician Bell's opinion that plaintiff should avoid concentrated exposure to respiratory irritants [Tr. 399], that restriction was based on Dr. McConnell's pulmonary study. [Tr. 400]. As noted above, however, Dr. McConnell observed that plaintiff "gave a very poor effort" on that study. [Tr. 364]. As also noted by the ALJ, 2001 and 2004 chest x-rays showed no acute cardiopulmonary disease. [Tr. 223, 282]. As further noted by the ALJ, plaintiff's continued smoking shatters his credibility on this issue. [Tr. 26].

Plaintiff next argues that his back and fibromyalgia conditions were improperly considered. As for his spinal impairment, the court notes that the objective evidence wildly ranges from "mild" [Tr. 171, 173-74] to "significant" [Tr. 171] to "unremarkable" [Tr. 181] to "extensive" [Tr. 194] to "minimal" [Tr. 364]. While plaintiff claims to be disabled because "I messed my spine up in 1994" [Tr. 353], he worked for six years after that injury.

Treating physician Menz opined, based on a probable "great deal" of symptom exaggeration, that plaintiff had no additional impairment beyond the nonacute changes that took place in 1994. [Tr. 156, 159]. As is his role, the ALJ weighed the conflicting evidence and restricted plaintiff to medium work, consistent with the opinions of the file-reviewing physicians and virtually consistent with the opinion of Dr. McConnell. [Tr. 26]. The substantial evidence standard of review permits that "zone of choice." *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).

As for fibromyalgia, the present case stands in contrast to the Sixth Circuit Court of Appeals's recent favorable decision in *Rogers v. Commissioner of Social Security*, where the administrative record was "replete with" credible fibromyalgia diagnoses. *See Rogers*, 486 F.3d 234, 244 (6th Cir. 2007). While Dr. Lurie and ANP Henry each diagnosed fibromyalgia on one occasion in light of excessive tenderness [Tr. 247, 277], Dr. Filka noted only some mild tenderness [Tr. 322-23] and Dr. Stone wrote that plaintiff's "chronic somatic pain of unknown etiology [was] *suggestive of* fibromyalgia" but could also be attributed to psychological factors. [Tr. 135-36] (emphasis added).

Ultimately, each of these alleged conditions (spinal impairment and fibromyalgia) is closely tied to plaintiff's subjective complaints of pain and fatigue. The ALJ was certainly within reason to view those complaints with some suspicion in light of the credibility issues rampant in the instant record. Four sources described symptom exaggeration and/or poor effort on testing [Tr. 159, 324, 364, 430-31], and Dr. Menz's post-

videotape comments are striking. [Tr. 159]. Further, as the ALJ suggested [Tr. 27-28], plaintiff's credibility is significantly diminished by his noncompliance with diet and exercise in controlling his health conditions. As cited in detail above, the record unquestionably contains substantial evidence to support the conclusion that plaintiff refuses to meaningfully participate in his own health care. His style of life is utterly inconsistent with that of a person who suffers from the limitations alleged. *See Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988).

The court stresses that this observation is not relevant merely to plaintiff's failure to *lose* weight. *See, e.g., Harris v. Heckler*, 756 F.2d 431, 435-36 n.2 (6th Cir. 1985) ("The [Commissioner] is certainly not entitled to presumptions that obesity is remediable or that an individual's failure to lose weight is 'wilful'. The notion that all fat people are self-indulgent souls who eat more than anyone ought appears to be no more than the baseless prejudice of the intolerant svelte.") (citation omitted). Instead, this evidence speaks to plaintiff's apparent failure to ever genuinely *attempt* to adhere to a proper diabetic diet, lose weight, or exercise - even after multiple sources have directly related these solutions to his purported physical complaints.

> The Social Security Act did not repeal the principle of individual responsibility. Each of us faces myriads of choices in life, and the choices we make, whether we like it or not, have consequences. If the claimant in this case chooses to drive himself to an early grave, that is his privilege – but if he is not truly disabled, he has no right to require those who pay social security taxes to help underwrite the cost of his ride.

*Sias*, 861 F.2d at 480.

This is an unusual case.  Multiple physicians have suggested that plaintiff's alleged pain is substantially psychological.  Conversely, several mental health professionals have suggested that plaintiff's depression and anxiety are caused by his physical condition.  The present ALJ's job was not an easy one.  Plaintiff could be the unfortunate subject of a complex physical and psychological condition, he could be a profound malingerer, or he could be anything in between.

Plaintiff has received numerous evaluations including - appropriately - an assessment by Dr. Engum "to determine whether psychological factors were substantially exacerbating his subjective experience of pain."  [Tr. 235].  Despite the potential psychological interplay, Dr. Engum (whose evaluation was far more comprehensive and informative than those typically presented to this court) concluded that plaintiff is capable of working and that he would benefit emotionally from doing so.  [Tr. 243].

This court will not reverse a decision of the Commissioner merely because a reasonable mind could have reached a different conclusion.  *See, e.g., Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  Under substantial evidence review, the ALJ decision at issue must be affirmed.  An order consistent with this opinion will be entered.

ENTER:


_____s/ Leon Jordan_____
United States District Judge

23